192 September 4, 2025 No. 789

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DYLAN DONAVAN WATERS,
*Defendant-Appellant.*

Tillamook County Circuit Court
22CR28786; A180549

Jonathan R. Hill, Judge.

Submitted January 9, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stephanie J. Hortsch, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

Defendant appeals a judgment of conviction entered after a jury found him guilty of two counts of felony fourth-degree assault, ORS 163.160(3). The charges arose out of a fight between defendant and his girlfriend's parents. At trial, over defendant's objection, the court allowed the state to play a video recording from the body camera of a sheriff's deputy who responded to a 9-1-1 call about the fight. In that video, the deputy confronts defendant with the parents' version of what happened, describes defendant as the aggressor in the fight, and states that it was a "big problem" that defendant had behaved that way in front of a child who was in the home during the fight. On appeal, defendant argues that the trial court erred in admitting the video because any probative value that it had was substantially outweighed by the risk of prejudice from the deputy vouching for the complainants' version of events and calling defendant the aggressor in a case in which that was a central issue. We agree with defendant and therefore reverse and remand.

We begin with an overview of the factual background and procedural history that gave rise to the evidentiary question before us. Defendant lived with his girlfriend, B; their daughter, M; B's older child, J; and B's parents, and L and G (her mother and father, respectively). On a June day in 2022, deputy sheriffs responded to a 9-1-1 call about an altercation at the property. By the time the deputies arrived, the altercation was over. Although accounts differed with regard to the specifics of the fight, the basic contours are not disputed: Defendant was upset because he believed that L and G's dog had bitten his daughter, M. Defendant had been drinking, and he went down the hallway to G's bedroom at one end of the house, where he angrily confronted G through a locked door. G eventually opened the door, and the two of them began to fight. L then entered the fray from an adjacent room, and the fight spilled down the hallway and into the living room, where it ended after L hit defendant with a skillet. One of the children, J, was in the living room during that time.

Deputy Wood was one of the deputies who responded to the 9-1-1 call. He was wearing a body camera when he arrived at the property, and he recorded his interactions

with defendant and the other residents. The camera footage involving defendant was later broken up into a series of clips, including clips that would be labeled at trial as State's Exhibits 1A, 1B, and 1C.

In the first of those clips, Exhibit 1A, defendant is standing outside the residence when he is approached by Deputy Wood. The timestamp on the clip shows that it was recorded around 9:30 p.m., and it is dusk but light enough outside to see defendant. Defendant tells the deputy that L and G's dog bit his daughter, M; that the dog had bitten him in the past; and that he had threatened to "end" the dog. Defendant reports being "accosted" by B's parents, and that L hit him in the nose and "whooped his ass" for saying the dog needs to go. The deputy asks defendant why he did not call 9-1-1, and defendant says that L was calling 9-1-1 while beating him up. Defendant's speech is halting and slurred, and the deputy asks defendant how much he has had to drink. Defendant tells the deputy that he had "four or five beers."

The second clip, Exhibit 1B, is timestamped at 10:09 p.m. and lasts less than 30 seconds. In that video, defendant and B are standing outside smoking, talking with Deputy Wood. It is dark outside, and their faces are barely visible; all that can be seen of defendant is a silhouette and lit cigarette. Defendant says, "Well, I'm sorry you guys had to come out here and fucking arrest my ass," and B asks about the charges. Defendant interjects that there "better be no charges" and expresses surprise when the deputy says it will be "Assault 4." Defendant then repeats that he has never assaulted anyone.

The third clip, Exhibit 1C, is the one that is the subject of this appeal. It picks up shortly after the second video and is timestamped at 10:10 p.m. As in the second video, it is dark and only defendant's silhouette and lit cigarette are visible. In the video, Deputy Wood confronts defendant with B's parents' version of events:

"DEPUTY WOOD:   So, there's a few things wrong here. Okay? You went to them on the other end of the house, all right?

"[DEFENDANT]:   Yeah.

"DEPUTY WOOD:   Alright. So, you can't go towards them and say things like, "I'm going to kick your ass," or "I'll fuck you up" and then bang on a door—

"[DEFENDANT]:   I didn't say that. No. He hit me—

"DEPUTY WOOD:   No, no, no, no.

"[DEFENDANT]:   He hit me—She hit me—

"DEPUTY WOOD:   Do you want to hear what I have to say or no?

"[B to DEFENDANT]:   Let him speak.

"DEPUTY WOOD:   Okay.

"[B]:   He has Asperger's.

"[DEFENDANT]:   I do have Asperger's.

"DEPUTY WOOD:   So, when you go down there and talk like that, they are threatened. You are the aggressor. Okay?

"[DEFENDANT]:   I wasn't the aggressor at the time.

"DEPUTY WOOD:   You don't get to say, 'I'm going to kick your ass,' or 'I'm going to fuck you up.'

"[DEFENDANT]:   That was after being punched and choked.

"DEPUTY WOOD:   Okay.

"[DEFENDANT]:   Do you understand? Do you see the blood all over me?

"DEPUTY WOOD:   I absolutely do, because a fight ensued and you wound up kind of almost getting the worst of it. Now, she's got a swollen eye and he's got a bruise already on his stomach from being punched.

"[DEFENDANT]:   No.

"DEPUTY WOOD:   Oh, yeah. It's already there. Oh, yeah. I got photos of it. Okay? Here's the other problem: we don't get to act like this in front of our children.

"[DEFENDANT]:   No. Not at all.

"[DEPUTY]:   That's a big problem.

"[DEFENDANT]:    Yeah.

"DEPUTY WOOD:    Okay. Big problem right now. She described everything.

"[B]:    Who, [J]?

"[DEFENDANT]:    She wasn't even in there.

"DEPUTY WOOD:    Yeah. She could hear everything.

"[B]:    They were in the living room.

"DEPUTY WOOD:    She heard you go down the hallway. She didn't see it. She heard you go down the hallway and bang on his door yelling at him. She could hear it, man. And then [M] woke up. All right. We're going to go get in the car."

Defendant was arrested and ultimately charged with two counts of felony fourth-degree assault constituting domestic violence. On the morning of trial, the parties addressed the admissibility of the video footage. Defendant explained that he had no objection to admission of Exhibit 1A, and, although he objected to admission of Exhibit 1B below, he does not reprise that argument on appeal. We therefore focus on defendant's objection to, and the court's admission of, Exhibit 1C, in which Deputy Wood confronts defendant with B's parents' version of events and describes him as the aggressor.

Defendant argued that Exhibit 1C was inadmissible because "[m]ostly it's a police officer pontificating about why domestic violence is bad and how the defendant is guilty," which is not evidence but rather the officer giving his opinion in the form of a closing argument and "effectively informing the jury of how they're supposed to be ruling." Defendant argued that the evidence "more or less constitutes vouching" as to whose version of events is correct, which is highly prejudicial and has little probative value.

In response, the state initially argued that Exhibit 1C was probative because of defendant's silence in response to the deputy's assertions of his guilt. But then, after playing the videos for the court, the state developed an argument that defendant made "some significant admissions in there," including that "[h]e acknowledges that he went down the

hall and confronted the victims" and "finally acknowledge[s] that he made the statements that have been attributed to him, and the evidence relating to, like, what the officer says about the bruises and stuff, we do have all those pictures." The state also argued that the evidence showed defendant's response to the deputy's assertions that a child, J, was present at the time and heard everything—specifically, that, in the "face of the evidence, *** he's sort of still taking a victim stance, but he's not actually explaining away the other people's injuries or what the little girl saw."

Defendant agreed with the prosecutor's representation that the state had additional evidence—in the form of pictures of the injuries and other evidence supporting B's parents' version of events—but argued that that fact cut the other way, demonstrating that the state did not have a need for the video recording. That is, defendant argued that the video would not show anything that the state could not prove with other evidence, and yet the video would allow the deputy to deliver a closing argument "summarizing the entire State's case and making it sound very clear and convincing that the defendant is guilty in a very authoritative manner."

The trial court agreed with the state, for the most part. It explained its reasoning as follows:

"So, there's a couple things that are on the video. How the defendant is acting, demeanor, if levels of intoxication are in play, the manner in which he's speaking. There is a conversation between the officer and [defendant]. That discussion would be admissible and why he did what he did as far as the officer, and why [defendant] was doing what he did, and then there's a discussion about what happened in front of children, and [defendant's] response to that. So, this is not a prior bad act situation. This is a probative—a relevance probative versus prejudicial discussion. It's actually very probative of both demeanor and actions and defendant's response to officer's questions. It is not an unfairly prejudicial piece of evidence and would be admissible for those purposes."

The court, however, ruled that the state would not be permitted to argue that defendant's silence was probative of his

guilt, which the court determined would constitute an impermissible comment on defendant's right to remain silent.

Exhibit 1C was later played at trial during the testimony of Deputy Wood, along with Exhibits 1A and 1B, as part of the state's case-in-chief. The state also offered testimony from J; body cam video of Deputy Wood's interview of J at the home; and testimony from both of B's parents, as well as photos of injuries to them. In the state's version of events, which it later argued during closing, defendant became intoxicated, provoked a violent response from B's elderly parents by charging down the hallway, rushing at G, and giving him an uppercut; and defendant was only claiming that he was acting in self-defense because he was injured in the fight.

Defendant's case consisted of his own testimony and testimony by B. In defendant's version of events, he confronted G through G's door. G then opened the door, grabbed defendant, and threw him to the ground. According to defendant, G kept pushing him to the ground until defendant punched G in the stomach, causing him to retreat; and, at that point, L ran out of her room and began hitting defendant.

During the parties' closing arguments, one of the central questions was whether defendant provoked the fight. The prosecutor argued that "[w]hat really matters here is who provoked the situation?" Toward the conclusion of rebuttal, the prosecutor argued that "he went down there looking for a fight, caused all this. You can't do stuff like that and then claim that his actions are self-defense, especially not when he's screaming at people he's going to fuck them up and all this other stuff."

The jury was instructed that defendant had raised the defense of self-defense, that "[a] person is justified in using physical force on another person to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force," and that "[i]n defending, a person may only use that degree of force which he reasonably believes to be necessary." However, after the jury began to deliberate, it sent two questions to the court that suggested uncertainty

about the law as it related to who initiated the altercation. The first was whether a defendant could "be charged and convicted with assault by initiating a verbal altercation, however the victim initiates the first physical contact altercation that ultimately resulted in their injury." And the second was "does the defendant have to throw the first punch." In response, the court crafted an answer that told the jury that it "must make their decision based on the evidence presented and the jury instructions. The jury must determine what the facts are and then apply the jury instructions to those facts."[1]

The jury ultimately convicted defendant of both counts of felony fourth-degree assault, ORS 163.160(3), one for assaulting G and the other for assaulting L.

On appeal, defendant argues, as he did below, that Deputy Wood's statements in Exhibit 1C recounting G's and L's versions of events as fact, asserting that defendant was the aggressor, and stating that it was a "big problem" that defendant had behaved that way in front of a child, should have been excluded under OEC 403, and that the error affected the verdict. *See* OEC 403 (providing that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence").

The analytical framework for a trial court's ruling on an OEC 403 objection is set forth in *State v. Mayfield*, 302 Or 631, 645-47, 733 P2d 438 (1987):

"First, the trial judge should assess the proponent's need for the [proffered evidence]. In other words, the judge should analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence. In the second step the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime. The third step is

---

[1] The parties did not request, and the court did not give, Uniform Criminal Jury Instruction 1110, which states, "Ordinarily a person is not justified in using physical force on another person if he was the initial aggressor." *See State v. Worsham*, 373 Or 739, 747, 571 P3d 759 (2025) (holding that the instruction is a correct statement of the law).

the judicial process of balancing the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice, and the fourth step is for the judge to make his or her ruling to admit all the proponent's evidence, to exclude all the proponent's evidence or to admit only part of the evidence.

"* * * * *

"* * * If admitted for a limited purpose, the court should give an appropriate limiting instruction to the jury."

We examine whether the trial court correctly applied the balancing test that OEC 403 prescribes for errors of law, but we review the trial court's ultimate determination as to whether evidence is unfairly prejudicial under OEC 403 for abuse of discretion. *State v. Boauod*, 302 Or App 67, 72-73, 459 P3d 903 (2020). "In evaluating a trial court's discretionary ruling under OEC 403, our role is to assess whether the court's decision falls within the range of legally permissible choices." *Id.* at 73 (internal quotation marks and citation omitted). "Absent a claim that a trial court has made a legal or factual error in making a discretionary determination under OEC 403, to determine whether the court's evidentiary ruling represents an abuse of discretion, we examine whether the court exercised its discretion to an end not justified by, and clearly against, evidence and reason." *Id.* (internal quotation marks, citation, and alteration omitted).

At the first step of the balancing test—assessing probative value—the trial court determined that the video showed how "defendant is acting, demeanor, if levels of intoxication are in play, the manner in which he's speaking," and was "very probative of both demeanor and actions and defendant's response to [the] officer's questions." The state defends that reasoning on appeal, arguing that the statements by Deputy Wood gave the jury context to "observe defendant's demeanor and reaction to [G] and [L] identifying him as the aggressor and to assess his level of intoxication, which was all relevant to the jury's credibility determinations."

Having viewed the video, we disagree that the challenged segments had any significant probative value for purposes of assessing defendant's level of intoxication, given the quality of the video and the state's other evidence

of defendant's demeanor and intoxication. First, defendant can barely be seen in Exhibit 1C; as noted earlier, only his silhouette and lit cigarette are visible. And the state had far better evidence of defendant's intoxication—including Exhibit 1A, which was filmed earlier in the evening. In Exhibit 1A, which was admitted without objection, defendant can be seen clearly, his speech is halting and slurred, and he admits drinking four or five beers. The state also had evidence that defendant's blood alcohol content was .21 at the jail. The exchanges between Deputy Wood and defendant in Exhibit 1C added little, if anything, to the jury's understanding of defendant's level of intoxication.

As for Deputy Wood's statements providing context for understanding defendant's responses and admissions, we agree with the trial court that the deputy's statements had some contextual probative value—but only minimally so. Defendant admits, in response to the questioning, that he "went to them on the other end of the house" and, although he denied saying he was going to "kick your ass" or "fuck you up" when he went toward them, he later acknowledged that he said those things "after being punched and choked." But throughout the video, the deputy is talking over defendant and asserting the alternative version of events. To the extent that the jury could draw anything from defendant's denials or demeanor on the video (and again, he is barely visible), it is difficult to see how it is especially probative of defendant's credibility.

Although we have some disagreement with the trial court's assessment of probative value, it is the later analytical steps that drive our conclusion that the trial court abused its discretion in admitting all of Deputy Wood's statements. At the second step—assessing risk of prejudice—the trial court stated, without further explanation, that the video is "not an unfairly prejudicial piece of evidence and would be admissible for those purposes." The prosecutor had argued that the prejudice was minimal because "what's important here are the defendant's statements, and clearly the officer in a criminal case thinks the defendant did it. That's why they arrested him." The state makes a similar argument on appeal—that it would already have been apparent to the

jury, even without Exhibit 1C, that Deputy Wood believed the victims' account of the altercation.

The trial court's reasoning, and the state's arguments on appeal, overlook the risk of prejudice created by introducing evidence that, even if not categorically inadmissible as vouching evidence, nevertheless poses vouching concerns. As the Supreme Court has explained, Oregon prohibits one witness vouching for the testimony of a witness or nonwitness complainant, and that rule extends to statements made out of court. *See State v. Black*, 364 Or 579, 581 n 1, 437 P3d 1121 (2019) ("When we refer to the 'vouching rule,' we refer to comments that bolster a witness's credibility and comments that undermine a witness's credibility."); *State v. Chandler*, 360 Or 323, 334, 380 P3d 932 (2016) (holding that the categorical prohibition on "vouching" extends to an out-of-court statement about the credibility of a witness or nonwitness complainant if the statement is offered for the truth of the credibility opinion that it expresses); *see also State v. Sperou*, 365 Or 121, 140, 442 P3d 581 (2019) ("In general, witness vouching in Oregon is considered prejudicial, so much so in fact that it sometimes requires intervention by the trial court even when parties fail to object to it.").

The deputy's statements in this case created the same risks that animate the vouching rule—that the jury would defer to the deputy's assessment of the complainants' credibility and defendant's guilt. In the video, the deputy delivers a forceful and authoritative description of what happened ("you can't go towards them and say things like, 'I'm going to kick your ass' or 'I'll fuck you up'"), refutes defendant's denials (interjecting "No, no, no, no" when defendant attempts to contradict the deputy's version of events), asserts that the complainants "are threatened" and defendant is "the aggressor." Even assuming that the deputy's statements were part of an investigatory technique, there was nothing in the video itself that would have mitigated the risk that the jury would have understood it otherwise— that is, the risk that a juror viewing the footage would have understood the deputy to be asserting his own view that he found the complainants credible and did not believe defendant's version of events. *See State v. Avdeyev*, 309 Or App 205,

212, 482 P3d 115 (2021) (explaining that the general rule is that witness vouching is prohibited whether the vouching opinion is express or implied in the witness's testimony).

The state's primary response to that risk is that the deputy's statements were not inadmissible as vouching evidence because they were offered for context and to demonstrate defendant's demeanor, not for the truth of the matter asserted. While that argument may have merit concerning the *categorical* prohibition on vouching evidence, it does not address the risk of the jury deferring to Deputy Wood's assessment of defendant's guilt. In *Chandler*, the Supreme Court made that point expressly: "[T]he fact that statements are not categorically prohibited under the vouching rule does not mean that they are necessarily admissible." 360 Or at 336. Where, as in this case, the objection is under OEC 403, a trial court must consider the *risk* that the statements will have the effect of impermissible vouching even if they are not categorically inadmissible. *See Black*, 364 Or at 593 ("If the testimony does not provide [a categorically inadmissible opinion about the truthfulness of another witness], the court must then consider any other objections to the testimony that are raised by the parties.").

Here, even if not categorically inadmissible as vouching, the forceful nature of the deputy's assertions about what happened conveyed his certainty about who was the "aggressor" in a case where that was a central question. As defendant correctly pointed out below, the deputy's statements to defendant about what he "can't do" and what "[y]ou don't get to say," and that defendant was the "aggressor," were delivered in the video like a closing argument. The deputy begins by identifying "a few things wrong here," setting out the complainants' version of events as fact, explaining that defendant's conduct threatened the complainants and made him the aggressor, stating that it was a big problem that defendant had behaved that way in front of a child, and then telling defendant that they are going to get into the police car. Admitting the statements and sending them to the jury carried a significant risk of the jury deferring to the deputy's on-the-ground assessment of who bore criminal

responsibility for the altercation, even if they were not cate-
gorically inadmissible as vouching.

Because the trial court's ruling did not properly
account for the dangers of admitting the deputy's state-
ments, it incorrectly balanced the danger of unfair prejudice
against the state's need for the evidence at the third step
of *Mayfield*; and, at the fourth step, erred by admitting the
entirety of Exhibit 1C rather than determining whether to
admit just part of the proffered evidence or provide a lim-
iting instruction to address the vouching risks. As noted
above, although some of the deputy's statements had some
probative value in providing context for defendant's admis-
sions and demeanor, that value was relatively low. And other
parts of the deputy's statements had almost no probative
value, in that the deputy was pressing the complainants'
version of events and talking over defendant's responses:

> "DEPUTY WOOD:  Alright. So, you can't go towards
> them and say things like, "I'm going to kick your ass," or
> "I'll fuck you up" and then bang on a door—
>
> "[DEFENDANT]:  I didn't say that. No. He hit me—
>
> "DEPUTY WOOD:  No, no, no, no.
>
> "[DEFENDANT]:  He hit me—She hit me—
>
> "DEPUTY WOOD:  Do you want to hear what I have to
> say or no?
>
> "[B to DEFENDANT]:  Let him speak.
>
> "DEPUTY WOOD:  Okay.
>
> "[B]:  He has Asperger's.
>
> "[DEFENDANT]:  I do have Asperger's.
>
> "DEPUTY WOOD:  So, when you go down there and
> talk like that, they are threatened. You are the aggressor.
> Okay?"

The probative value of that exchange, if any, was substan-
tially outweighed by the danger of prejudice in admitting it
without any limiting instruction, and the court abused its
discretion by admitting that portion of the exhibit at the
very least.

We further conclude that the error prejudiced defendant and requires reversal. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?"). One of the central questions in the case was, in the prosecutor's words, "who provoked the situation?" And, as the jury's questions during deliberations reflect, the jury was trying to determine whether defendant could be convicted for assault "by initiating a verbal altercation" if "the victim initiates the first physical contact altercation that ultimately resulted in their injury," and whether defendant had to "throw the first punch" in order to be convicted. *See generally State v. Worsham*, 373 Or 739, 744, 571 P3d 759 (2025) (explaining that it would be incorrect to convey to the jury the idea that one could be an initial aggressor through words alone, citing *Penn v. Henderson*, 174 Or 1, 14, 146 P2d 760 (1944) ("[P]rovocation by mere words, if unaccompanied by any overt act of hostility, will not justify an assault.")). The court responded by directing the jurors to decide the case based on the evidence presented and the jury instructions. In the absence of further instruction from the court about the provocation issue, the balance may well have been tipped by Deputy Wood's statements that defendant's actions had threatened the complainants and made him the aggressor. We therefore reverse and remand.

Reversed and remanded.