KISTLER, J.
*44 **394 A trial court may exclude relevant evidence if the "probative value [of the evidence] is substantially outweighed by the danger of unfair prejudice." OEC 403. In this case, the trial court admitted a booking video of defendant over an OEC 403 objection because the video bore on the central issue in the case-the identity of the person who had taken money from the victim's bank account. A divided Court of Appeals reversed the trial court's ruling, not because the trial court had abused its discretion in admitting the video but because it had failed to sufficiently explain the basis for its ruling. State v. Anderson , 282 Or. App. 24, 386 P.3d 154 (2016). We allowed the state's petition for review to consider that recurring issue. We now reverse the Court of Appeals decision and affirm the trial court's judgment.
Three people-Debra, Michelle, and Charles-shared a house in Lincoln City. Defendant needed a place to stay, and Debra and Michelle agreed that defendant could "crash" at their house for a couple of days.[1] The weekend after defendant began staying at their house, Debra tried to withdraw money from her Wells Fargo bank account at an ATM but was unable to do so.
On Monday morning, Debra checked with Wells Fargo and learned that someone had withdrawn $300 from her account at a Wells Fargo ATM and that the personal identification number (PIN) for her account had been changed. She also learned that, six or seven minutes after $300 had been withdrawn from the Wells Fargo ATM, someone had attempted to withdraw additional funds from her account at a nearby Bank of America ATM.
After learning that information, Debra went home and found that her emergency ATM card, with her PIN attached, had been taken from the dresser drawer in her bedroom. She also realized that defendant had moved out of her house on Sunday rather than later, as he initially had planned.
**395 Debra notified the police, who obtained a surveillance video from the Bank of America ATM.[2] The police showed Debra and Michelle stills taken from the video, which depicted a person attempting to use Debra's ATM card at the Bank of America ATM and also walking away from the ATM. The stills either do not show the person's face or do not do so clearly. Despite that fact, both Debra and Michelle identified the person in the stills as defendant, based on the clothing that the person was wearing and the person's general physical resemblance (height and build) to defendant.
When asked at trial what stood out to her about the person depicted in the stills, Debra testified:
"The red gloves, the shoes he's wearing, the pants that he's wearing, uh, the coat. I mean, the stuff is what I had seen [defendant] in all the days that he had been staying at our house. A hoodie. A gray hoodie, which is underneath this."
Both Debra and Michelle described the red gloves pictured in the stills as distinctive; there is a print of a skeleton's fingers on the gloves, which were similar to gloves that Debra and Michelle had seen defendant wear.
On cross-examination, defense counsel brought out that the person's face in the stills could not be seen clearly, that the clothes were relatively common, and that it was not completely clear from the stills how tall the person was. Defense counsel also elicited testimony from Debra and Michelle that they had had "prior theft issues at the house," that their roommate Charles had a gambling problem, and that Charles had twice stolen the rent money. Both Debra and Michelle testified, however, that the person *45 in the stills did not resemble Charles, who had a moustache.
To support its claim that defendant was the person depicted in the stills, the state offered a booking video of defendant taken approximately two weeks after the withdrawal from Debra's bank account. The state wanted to introduce the video to show that defendant was wearing the same or similar clothing in the booking video as the person **396 depicted in the Bank of America stills. Defendant objected to the video's admission, and the parties engaged in the following colloquy with the court outside the jury's presence:
"[DEFENSE COUNSEL]: [What] I'm expecting [the state] to show here is there's some, um, some video of [defendant] walking into the jail after he was arrested. So he's kind of, uh, in handcuffs, walking into the jail. There's no audio.
"* * * * *
"I guess what my concern becomes is it's showing [defendant] in custody. Just as in trial here, um, you know, the jury's not to know custodial status, seeing him, you know, with the walk of shame, handcuffs on, being taken to the jail I think creates a, creates a problem for us. Even understanding the State's trying to show it for what he's wearing, nonetheless, it's, it's certainly showing him in, in police custody, and that's where my, um, my concern lies.
"THE COURT: Is that an objection?
"[DEFENSE COUNSEL]: Yes. That's my-my objection is to the, uh, admissibility of this, of this video on those grounds.
"THE COURT: And, and the-and what's the objection? I mean, what's-what rule do you cite to say it's [not admissible]?
"[DEFENSE COUNSEL]: [I] guess it always comes down to, in a, in a relevance type of situation, the, uh, comparing the relevance, which I'll, I'll concede there is some relevance there because there's, uh-we're talking about the clothing, but versus the, the prejudicial value here.
"Now the jury can certainly never know while I'm in trial, you know, we don't bring [defendant] in with the orange jumpsuit because, uh, the, the jury can never know. It's prejudicial for them to know that he's in custody on this.
"I think we have the similar problem, um, with the, with the parade into the jail. I think this becomes more problematic, because I think that he was, he was brought in on a probation violation, um, as he was brought into the jail. So it's not just like a DUI situation where [you] see the video of the person being arrested right then. This is **397 a, a later video of when he's brought in. And, um, I, I guess my concern is the prejudicial effect. That this creates, um, weight against the, the relevance value of it. It's, um, it's too prejudicial showing, frankly, my client's custody status.
"THE COURT: And, uh, just from the file, I'm going to guess you're going to tell me that the arrest was at 7:30 p.m. on November 6, 2012.[3 ]"[DEFENSE COUNSEL]: I-I'd have to look ***.
"THE COURT: So almost four weeks-three and a half weeks after the event.[4 ]
"[DEFENSE COUNSEL]: Yes. It wasn't contemporaneous with the event at all.
"* * * * *
"[PROSECUTOR]: I'm pretty sure it was November 2nd.
"* * * * *
"THE COURT: [Y]our response to *** [defense counsel's] objection?
"[PROSECUTOR]: Okay. So it's, um, two-fold. Obviously this is very, um, relevant information that the State is seeking to elicit. The fact that he was wearing the same, um, clothing, essentially, very similar clothing to, um, the time in the video.
*46 "We know that, um, Defendant actually left a duffle bag with other clothing at somebody else's house, so he was missing clothing. So the fact that several days later he's in this, uh, real similar outfit is very relevant to the State's case to prove identity which, obviously, as [defense counsel] has pointed out time and time again, is the central issue of the case. So, um, it's highly relevant for that purpose.
"[While] I understand that showing, um-or alluding to the Defendant's current custody status, whether he's **398 in custody now or not, um, is prejudicial and is, is error, I think talking about the booking process and the fact that, yes, there are videos in the jail, everybody has to get booked on charges, which is the, the line of questioning I was going to ask [my police officer witness], I don't see how that is so, um, prejudicial in this case, um, to exclude this highly, um, probative, relevant information, Your Honor.
"THE COURT: Um, I'm thinking-How long is the video?
"[PROSECUTOR]: It's maybe a minute. The portion I'm going to show [is about a minute].
"THE COURT: [I'd like to see what you want to offer]. Frankly, it'll help me decide the balancing issue."
After the trial court viewed the video, the colloquy continued.
"[PROSECUTOR]: That's it.
"THE COURT: Um, could I take another look? I want to get a-
"[PROSECUTOR]: Yes.
"THE COURT: Maybe if you could stop when he's coming through the doorway there, just so I could take a look at the clothing and-"
After the court viewed the booking video a second time, the colloquy continued.
"THE COURT: So when he gets kind of right here in front of that gray cabinet, it'll, it'll see pants and shoes and top.
"Right there.
"[PROSECUTOR]: So you see the dark hoodie, the same fading type of jeans, and the same shoes. Same type of shoes.
"*** Your Honor, for the record, I just wanted to point [out that the time stamp shows that this video was taken] November 2nd of 2012.
"* * * * *
"THE COURT: [That's] what? Five days closer to the event in question. About twenty days after [the incidents with the ATM card].
**399 "Um, um, it's relevant. I'll give, uh, a cautionary instruction. So I'm going to overrule the objection."
After the trial court overruled defendant's objection, the state introduced the video through a sheriff's deputy, who described it to the jury as a booking video that is taken "when people are getting booked on charges and that sort of thing."[5] After watching the booking video and considering the other evidence in the case, the jury convicted defendant of two counts of identity theft and one count of second-degree theft.[6]
Before the Court of Appeals, defendant assigned error to the ruling admitting the booking video and advanced two arguments why the trial court erred in admitting it. First, relying on State v. Mayfield , 302 Or. 631, 733 P.2d 438 (1987), defendant argued that the trial court should have provided a more complete explanation of its ruling; specifically, he argued that the trial court should have identified on the record the nature of the competing interests at stake and then explained how it balanced them. Second, defendant argued that, even if the trial court's explanation were sufficient, the court abused its discretion in balancing the probative value of the video against the danger of unfair prejudice.
*47 The Court of Appeals unanimously disagreed with defendant's second argument; it concluded that admitting the booking video did not constitute an abuse of discretion. Anderson , 282 Or. App. at 25 n. 1, 386 P.3d 154. However, only a majority of the panel agreed with defendant's first argument-that Mayfield required a more complete explanation of the trial court's OEC 403 ruling. The majority was troubled by the trial court's reference to the video's "relevance" and explained that an OEC 403 analysis requires more than a determination of relevance. Id. at 28, 386 P.3d 154. It noted that the trial court did not expressly identify the probative value of the booking video, consider the prejudice resulting from showing defendant in custody, or expressly balance the probative value of the evidence against its prejudicial effect. Id. at 29-32, 386 P.3d 154.[7] Judge DeVore dissented, reasoning that the trial court's analysis, considered in the context of the parties' arguments, complied with Mayfield 's requirement that a trial court make a record that reflects its exercise of discretion. Id. at 34-37, 386 P.3d 154 (DeVore, J., dissenting).
On review, the state argues that the Court of Appeals misperceived what Mayfield requires. It notes that OEC 403 does not expressly require that trial courts make factual findings or state their reasoning on the record, as other evidence rules and statutes do. See OEC 803(24) (requiring predicate findings); ORS 137.120(1) (requiring that the trial court state its reasoning on the record). And the state urges us to read Mayfield narrowly, which it contends focused on the merits of the OEC 403 ruling, not the sufficiency of the trial court's explanation. Finally, the state notes that a more comprehensive explanation is not required to permit meaningful appellate review. Defendant, for his part, reads Mayfield as part of a broader line of cases that have required trial courts to articulate the premises of their decisions to facilitate meaningful appellate review-a requirement that, he asserts, is uniquely appropriate in light of the complexity inherent in OEC 403 rulings.[8]
Given the Court of Appeals' reliance on Mayfield , we begin with that decision and explain why we conclude that the trial court's explanation was sufficient to comply with Mayfield . We then turn to the state's preservation argument and defendant's argument that a more extensive explanation was necessary to facilitate appellate review.
The OEC 403 issue in Mayfield arose in an unusual posture. The state had charged the defendant in that case with sexually abusing his fiancée's eight-year-old daughter. At trial, the defendant questioned the child's credibility because she had failed to mention any sexual abuse when a caseworker from the Children's Services Division (CSD) had interviewed her. 302 Or. at 634, 733 P.2d 438. The child reported the abuse to her mother after the CSD interview, and the defendant argued that the reported abuse was part of a larger effort orchestrated by the child's mother to keep the defendant from gaining custody of the couple's two-year-old son. Id.[9] In response to that defense, the state elicited evidence from the child that she had denied any sexual abuse to the caseworker because she feared that she would not see her mother again if she accused the defendant of abuse. Id.
The state also sought to introduce the child's testimony that she was aware (based on what she had seen and what her mother had told her) that the defendant had sexually *48 abused her younger sister. The state argued that that evidence was relevant for two reasons. First, the CSD caseworker was investigating alleged sexual abuse of the younger sister, and the child's knowledge of that abuse explained why the CSD caseworker was interviewing her. Id. at 634, 733 P.2d 438. Second, the state argued that, when the child learned that the defendant might gain custody of her younger brother, she became concerned that the defendant would sexually abuse her brother as he had abused her and her younger sister. Id. at 635, 733 P.2d 438. It followed, the state argued, that the child's knowledge that the defendant had sexually abused her younger sister was relevant to explain why the child came forward after the CSD interview and told her mother that the defendant also had sexually abused her.
Initially, the trial court ruled that the first ground the state identified for admitting evidence of the younger sister's abuse was not sufficient. Id. at 636, 733 P.2d 438. It reasoned that the evidence was highly prejudicial while the state's interest in explaining why the CSD caseworker was interviewing the child was minimal. Id. However, after further consideration, the trial court concluded that the state had a strong interest in rehabilitating the child (its primary witness regarding the charged crimes) by showing why she had reported the abuse to her mother after having denied any abuse to the CSD caseworker. Id. at 636-37, 733 P.2d 438. The court accordingly concluded that that interest justified admitting evidence of the child's knowledge about the defendant's sexual abuse of her younger sister. Later, the trial court admitted the CSD caseworker's conclusion that the defendant had sexually abused the younger sister, even though the child was unaware of that conclusion. Id. at 643-44, 733 P.2d 438.
The defendant objected to the admission of that evidence primarily on relevance and hearsay grounds. Id. at 639-40, 644, 733 P.2d 438.[10] Despite that limited focus, the trial court initially balanced the prejudicial effect of that evidence against its probative value. See id. at 636, 733 P.2d 438 (noting that the trial court had balanced the prejudicial effect of the evidence against the state's interest in explaining why the child was being interviewed by CSD). Additionally, this court later explained that the trial court had "agonized" over the probative value of the evidence, its prejudicial effect, and balancing those interests against each other. Id. at 645, 733 P.2d 438. This court also explained, however, that despite considering those factors, the trial court "somehow felt obliged to admit all the evidence" and did not recognize that OEC 403 permitted it to exclude evidence of the younger sister's abuse if its probative value was substantially outweighed by the danger of unfair prejudice. Id.
Having observed that OEC 403 was available, this court undertook to provide a comprehensive explanation of that rule; that is, the court used the decision in Mayfield to educate the bench and bar about OEC 403. This court explained when evidence will be unfairly prejudicial under OEC 403. Id. at 644, 733 P.2d 438. It observed that the burden rests on the proponent of uncharged misconduct evidence to convince the trial court that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Id. at 645, 733 P.2d 438. And it observed that the "judge errs if the judge fails to exercise discretion, refuses to exercise discretion or fails to make a record which reflects an exercise of discretion." Id. Finally, the court explained:
"In making this decision under OEC 403, the judge should engage in four steps. First, the trial judge should assess the proponent's need for the uncharged misconduct evidence. In other words, the judge should analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence. In *49 the second step the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime. The third step is the judicial process of balancing the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice, and the fourth step is for the judge to make his or her ruling to admit all the proponent's evidence, to exclude all the proponent's evidence or to admit only part of the evidence."
Id.
Having explained how a court should resolve an OEC 403 objection, this court turned to the trial court's rulings admitting evidence of the defendant's abuse of the younger sister. This court did not fault the trial court for failing to make a record that reflected its exercise of discretion. Indeed, it explained that it was "apparent that the trial judge agonized over each of [the four considerations quoted above] but somehow felt obliged to admit all the evidence." Id. Rather, this court explained that the difficulty with the trial court's rulings was that it had abused its discretion in admitting the challenged evidence. Id. at 646-47, 733 P.2d 438. The trial court gave too much weight to the probative value of the evidence, gave too little weight to the danger of unfair prejudice, and erred in striking the balance between the two. Id.[11]
Mayfield provides valuable guidance for trial and appellate courts on the meaning and application of OEC 403. However, that decision does not set out a checklist that trial courts must mechanically tick off on the record or risk reversal. Rather, it identifies the factors a trial court should consider in exercising its discretion under OEC 403, and it recognizes that the record should reflect that the trial court exercised its discretion in resolving the objection. Id. at 645, 733 P.2d 438. Beyond that, however, Mayfield provides little guidance as to how or to what extent the record should reflect the trial court's exercise of discretion. As explained above, the problem in Mayfield was not that the trial court had failed to consider the relevant factors. Rather, the problem in Mayfield was that, after considering the relevant factors, the trial court had abused its discretion in admitting the challenged evidence. As a result, the decision in Mayfield does not provide a benchmark for measuring the sufficiency of a trial court's explanation of its OEC 403 ruling.
Our cases since Mayfield provide greater guidance on that issue. In State v. Turnidge , 359 Or. 364, 374 P.3d 853 (2016), for example, this court upheld the admission of prior bad acts evidence even though "the trial court did not specifically articulate its findings in terms of the 'probative' versus 'prejudicial' value of the evidence." Id. at 443, 374 P.3d 853. As this court explained, the trial court initially declined to admit the prior bad acts evidence because it was relevant only to show propensity; however, the trial court held out the possibility that, as the trial progressed, the evidence could turn out to be relevant for nonpropensity purposes. Id. at 427, 374 P.3d 853.
Later, at trial, the state identified why it viewed the evidence as relevant for reasons other than propensity, and the parties "debated whether the probative value of the evidence was significantly outweighed by its prejudicial impact." Id. at 428, 374 P.3d 853. After considering the parties' arguments, the trial court stated that the prior bad acts evidence is " 'similar [to the charged crime], it's unique, and it's only separated in time.' " Id. (quoting the trial court's ruling). We explained that the trial court's statement, considered in light of the parties' arguments, *50 provided a sufficient explanation of the court's resolution of the OEC 403 issue, particularly when the defendant had failed to raise any objection to the sufficiency of the explanation or request a more complete explanation. Id. at 443, 374 P.3d 853.
Similarly, in State v. Johanesen , 319 Or. 128, 137-39, 873 P.2d 1065 (1994), the defendant's investigator showed a photo array of possible suspects to an eyewitness, who identified someone other than the defendant as the culprit. This court upheld the trial court's OEC 403 ruling excluding the eyewitness's identification because the photo array was misleading. The trial court stated that the array presented a danger of misleading the jury, but it neither expressly identified the probative value of the evidence nor did it expressly consider whether the danger of unfair prejudice substantially outweighed the evidence's probative value. Id. at 139, 873 P.2d 1065. The defendant in Johanesen had acknowledged at trial that the court's explanation of its OEC 403 ruling was sufficient, and this court accordingly held that the trial court did not err in excluding the eyewitness identification. Id. ; see also State v. Barkley , 315 Or. 420, 432, 846 P.2d 390 (1993) (holding that the trial court had made a sufficient record under Mayfield of its OEC 403 ruling).[12]
To be sure, we have reversed a trial court's OEC 403 ruling when, among other issues, the record reveals that "the trial judge did not engage in a weighing process at all." State v. Knight , 343 Or. 469, 483, 173 P.3d 1210 (2007).[13] Similarly, when a trial court incorrectly viewed the challenged evidence as irrelevant and failed to consider whether the evidence was "unfairly prejudicial," this court reversed a trial court's OEC 403 ruling excluding the evidence. State v. Davis , 336 Or. 19, 27, 77 P.3d 1111 (2003) ; see also Macy v. Blatchford , 330 Or. 444, 455, 8 P.3d 204 (2000) (noting that the trial court's OEC 403 ruling had applied the wrong legal standard and holding that, under the correct standard, the evidence was admissible).[14] However, this court has not held that a trial court must recite on the record how it evaluated the probative and prejudicial value of evidence and how it balanced the two. Rather, as Turnidge demonstrates, a court will make a sufficient record under Mayfield if the trial court's ruling, considered in light of the parties' arguments, demonstrates that the court balanced the appropriate considerations.
With that standard in mind, we turn to the parties' arguments before the trial court. As set out above, both parties focused on the probative value of the booking video, the danger of unfair prejudice, and the balance the court should strike. The prosecutor explained that, because defendant's clothing in the booking video was "real similar" to that worn by the person who had used Debra's ATM card, the video was "very relevant to the State's case to prove identity," which the parties agreed was the central issue in the case. The prosecutor acknowledged that, although seeing defendant in handcuffs in the booking video had a potential for prejudice, *51 the prejudice was minimized by the fact that the jury would understand that booking is a process that everyone charged with a crime must go through. In light of that consideration, the prosecutor explained that she did not see how the booking video was "so, um, prejudicial in this case, um, to exclude this highly, um, probative, relevant information."
Defendant took a different view. He acknowledged that the booking video had "some relevance," but he contended that the prejudicial effect of seeing him in handcuffs in the booking video was essentially the same as seeing him wear prison garb during trial. As a result, he argued that the booking video was "too prejudicial" to be admissible.
In considering the parties' arguments, the trial court asked to see the part of the booking video that the state wanted to offer at trial. The trial court explained that, "[f]rankly, it'll help me decide the balancing issue." The court watched the video once. It then asked if it could look at it again and asked if the state could stop the video "when he's coming through the doorway there, just so I could take a look at the clothing." The court noted that it wanted to see the video where it showed defendant's pants and shoes. The prosecutor commented that the video showed defendant wearing "the dark hoodie, the same fading type of jeans, and the same shoes." After clarifying that the booking video was taken closer in time than it initially had understood, the court ruled, "Um, um, it's relevant. I'll give, uh, a cautionary instruction. So I'm going to overrule the objection."
Viewing the trial court's ruling in light of the parties' arguments, we conclude that the record demonstrates that the trial court assessed the probative value of the booking video. The probative value of evidence is a function of two variables: the degree to which evidence is relevant to prove or disprove an issue and the extent to which that issue is material to the resolution of the case. Here, the state argued (and defendant did not dispute) that the central issue at trial was identification: Was defendant the person pictured in the Bank of America stills? And the state argued that the booking video was "very relevant" and "highly relevant" to prove that issue, while defendant argued that the video had only "some relevance." That is, the parties disputed the degree to which the booking video was relevant to prove that defendant was the person in the Bank of America stills, and that issue turned on the similarity between the clothes shown in the video and the stills.
The trial court sought to resolve that dispute by viewing the booking video twice and asking the state to stop the video so that the court could examine the clothes that defendant was wearing in the video-clothes that the state reminded the court were very similar to the ones shown in the stills. Read in the context of the parties' arguments, the trial court's statement that the video was "relevant" reflects its determination that the clothing was sufficiently similar to and possessed a sufficient degree of relevance on the central issue in the case to admit the video over defendant's OEC 403 objection.
We agree with the Court of Appeals' observation that in some cases describing evidence as "relevant" will mean only that the evidence has a minimal tendency to prove or disprove an issue in a case. However, viewed in context of the parties' debate and the court's examination of the booking video, the trial court's use of the word "relevant" served as a shorthand way of describing the trial court's agreement with the state that the video was very relevant to prove a central issue in the case.
Similarly, the parties' arguments regarding prejudice fairly exhausted the subject. Defendant argued that a booking video showing him walking into the jail in handcuffs is effectively no less prejudicial than having him sit through trial in prison garb. The state argued in response that the jury would not place undue significance on seeing defendant in handcuffs in the booking video because the testimony would remind the jury that booking is an ordinary process that everyone charged with a crime must undergo. In asking to view the video, the trial court explained that doing so-i.e. , seeing the degree of similarity between the clothing-will "help me decide the balancing issue." In context, the trial court's statement is sufficient *52 for us to conclude that it balanced the probative value of the booking video against the danger of unfair prejudice.
We appreciate the Court of Appeals' thoughtful opinions in this case. And it is true, as the majority in the Court of Appeals observed, that the trial court did not expressly assess the probative value of the booking video and the danger of unfair prejudice, nor did it expressly balance those two concepts. However, the same could be said about the trial courts' OEC 403 rulings in Turnidge , Johanesen , and Barkley , all of which this court upheld because we could determine from the record that the trial court had considered and weighed those factors. Put differently, Mayfield sets out the factors that trial courts should consider in resolving an OEC 403 objection, but it does not require that trial courts go through a checklist on the record in order to avoid a reversal or a remand. Rather, as Turnidge and Johanesen make clear, in assessing the sufficiency of a trial court's explanation of its OEC 403 ruling, appellate courts should consider the trial court's ruling in light of the arguments that the parties made on the merits of the issues raised by an OEC 403 objection, as well as whether either party asked the court to provide a more complete explanation of its ruling. Considering the trial court's statements in light of the parties' arguments, we conclude that the record sufficiently reflects that the trial court balanced the probative value of the booking video against its prejudicial effect, particularly in light of defendant's failure to raise any issue at trial regarding the sufficiency of the court's explanation of its ruling. See Turnidge , 359 Or. at 443, 374 P.3d 853.
Having concluded that the record created in the trial court complied with Mayfield , we briefly address two other issues. The state renews its argument that defendant's failure to object to the sufficiency of the trial court's explanation at trial is a complete bar to his raising that issue on review. The state recognizes that Mayfield explained that a trial court errs if it fails to make a record reflecting its exercise of discretion. However, it argues that in Peeples v. Lampert , 345 Or. 209, 191 P.3d 637 (2008), this court held that normal preservation rules apply to findings required for meaningful appellate review. See id. at 223, 191 P.3d 637 (so holding). In the state's view, defendant's failure to object to the sufficiency of the trial court's explanation of its OEC 403 ruling precluded him from raising that issue on appeal.
In our view, a third case bears on the state's preservation argument. As explained above, in Turnidge , the defendant failed to object to the sufficiency of the trial court's explanation of its OEC 403 ruling. 359 Or. at 443, 374 P.3d 853. This court did not hold, however, that the defendant's failure to object completely precluded him from raising the sufficiency of the ruling on appeal. Id. Rather, the court recognized that the absence of a request for further explanation was a factor that bore on the sufficiency of the explanation that the trial court provided. Id. We need not resolve how Turnidge , Peeples , and Mayfield should be reconciled to decide this case. In this case, it is sufficient to hold that the trial court's explanation of its OEC 403 ruling complied with Mayfield and Turnidge .
Defendant raises one other issue that requires discussion. He contends that not only does Mayfield require an explanation of the trial court's OEC 403 rulings, but a more complete explanation is necessary to facilitate meaningful appellate review. To the extent that defendant argues that a further explanation than Mayfield requires is necessary to facilitate meaningful appellate review, Peeples provides the answer to that argument. As Peeples explained, ordinary preservation rules apply to claims that a trial court failed to make findings necessary for meaningful appellate review. 345 Or. at 223, 191 P.3d 637. If defendant believed that further explanation than the trial court provided was necessary for meaningful appellate review, it was incumbent on him to request it. See id. Having failed to raise that issue below, defendant cannot fault the trial court for failing to make findings beyond those required by Mayfield.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

Debra knew defendant from working with him. Michelle knew defendant because he was her daughter's good friend.

No surveillance video was available from the Wells Fargo ATM where the money had actually been withdrawn from Debra's account.

The booking video was taken on November 2, not November 6, 2012.

Even if the booking video had been taken on November 6, 2012, as the trial court understood, it would have been taken 16 days after the theft at the ATM on October 21, 2012, not three and one-half weeks later as the trial court stated. Later, when the trial court understood that the booking video was taken on November 2, 2012, it stated that the video was taken approximately 20 days after the theft. The actual difference is 12 days.

The video was taken when defendant was being booked on a different charge. However, no witness mentioned that fact to the jury, and defendant does not argue that the booking video was evidence of other crimes that might implicate OEC 404(3).

Although the trial court stated that it would give a cautionary instruction when the video was played for the jury, it did not do so. Defendant did not propose a cautionary objection, object to the failure to give a cautionary instruction, or assign error to its omission.

In reaching that conclusion, the court rejected the state's argument that defendant had failed to object to the sufficiency of the trial court's explanation. Id. at 28 n. 3, 386 P.3d 154. The Court of Appeals reasoned that, "given Mayfield 's clear directive that the 'judge errs if the judge *** fails to make a record which reflects an exercise of discretion,' 302 Or. at 645, 733 P.2d 438, defendant's request for [OEC 403 ] balancing advised the trial court of the need to both engage in balancing and make a record of that balancing and, thus, preserved the error." Id. (ellipses in Court of Appeals decision).

On review, defendant does not challenge the Court of Appeals' conclusion that admitting the booking video was not an abuse of discretion.

The mother had three children: the 8-year-old daughter, a 3-year-old daughter, and a 2-year-old son. 302 Or. at 633-34, 733 P.2d 438. The defendant was the father of the son but not the daughters. We refer to the 8-year-old daughter, whose alleged sexual abuse gave rise to the charges in Mayfield , as the child.

As noted, the child testified about the defendant's abuse of her younger sister, based in part on what the child's mother had told her. 302 Or. at 640, 733 P.2d 438. Defendant objected to that testimony primarily on hearsay grounds but added an OEC 403 objection. See id. (quoting counsel's objection). This court, however, described counsel's objection as being based on hearsay and relevance, id. at 641-42, 733 P.2d 438, although it later explained that the problem with that and other testimony regarding the abuse of the younger sister was that its probative value was substantially outweighed by its prejudicial value. See id. at 641, 644-47, 733 P.2d 438.

There is admittedly some tension in the analysis in Mayfield . On the one hand, this court explained that defense counsel objected to the evidence on relevance and hearsay grounds and that the trial court "felt obliged" to admit the evidence despite its misgivings about its prejudicial effect. Those statements suggest that the trial court did not engage in balancing. On the other hand, this court stated that the trial court agonized over each of the four factors that Mayfield identified, which suggests that the trial court did engage in balancing. Ultimately, this court appears to have concluded that the trial court engaged in balancing but abused its discretion in admitting the challenged evidence. See 302 Or. at 646-47, 733 P.2d 438 (explaining why each of the four factors leads to a conclusion that the challenged evidence was inadmissible).

In Barkley , the court held that the trial court provided a sufficient explanation of its OEC 403 ruling, but the opinion does not set out the trial court's ruling. See 315 Or. at 432, 846 P.2d 390. The parties' briefs in the Court of Appeals provide more insight. They show that the trial court initially told counsel that it did not know "whether [the proffered evidence's] probative value would outweigh its prejudice." After hearing argument from counsel on that issue, the court stated "I understand your position. I've got to deny the motion." As the briefs in Barkley make clear, this court considered the trial court's ruling in the context of the parties' arguments in determining the sufficiency of the trial court's explanation of its OEC 403 ruling.

The court's holding in Knight did not turn on the trial court's failure to explain its OEC 403 ruling. Rather, the holding turned on the trial court's abuse of discretion in admitting the challenged statements. See 343 Or. at 485, 173 P.3d 1210 (so holding). Consistently, this court explained in Knight that the challenged statements, even if relevant, "were by no means essential" to the state's case, id. at 481, 173 P.3d 1210, and it also observed that the trial court had "vastly underestimated" the risk of unfair prejudice that the statements posed, id. at 482, 173 P.3d 1210.

In Macy , the trial court had excluded evidence under OEC 403 on the ground that it was too prejudicial. See 330 Or. at 455, 8 P.3d 204. This court, however, explained that the question was not whether the evidence was prejudicial but whether it was unfairly prejudicial. Id. Applying the correct standard, this court ruled that the challenged evidence was admissible. Id.