Argued and submitted October 27, 2021, affirmed January 5, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NOAH JONATHAN POWERS,
fka Noah Harouff,
*Defendant-Appellant.*

Marion County Circuit Court
18CR51360; A172142

523 P3d 1112

Defendant appeals from a judgment of conviction for four sexual offenses involving his stepdaughter. In his first assignment of error, defendant asserts that the trial court erred when it admitted court-certified copies of defendant's 2006 convictions for attempted sexual abuse against another stepdaughter from an earlier relationship, H, and testimony from H about her age and relationship to defendant at the time of the offenses. The court ruled that that evidence was admissible under OEC 404(3) to prove that defendant acted "intentionally" and under OEC 404(4), to prove his "sexual interest in children." Defendant next assigns error to the trial court's ruling limiting his cross-examination of the victim's mother. He contends that his questions were permissible bases for testing mother's credibility and potential biases and would have produced evidence critical to his theory of defense. In his third assignment of error, defendant argues that the trial court erred in allowing portions of the mother's testimony on the grounds that it was irrelevant, and, even if marginally relevant, unduly prejudicial under OEC 403. Defendant also argues that the trial court erred in overruling defendant's relevance objection to evidence that defendant had hired a handwriting expert who ultimately testified for the state on rebuttal. *Held*: First, although the trial court erred in admitting evidence of defendant's prior bad acts under OEC 404(3), it did not err or abuse its discretion in admitting the evidence under OEC 404(4). The underlying offenses and the children's ages and relationships to defendant were very similar, the state needed the evidence to show that defendant acted with a sexual purpose because defendant disputed that he had ever touched L with a sexual purpose, and the court made use of a limiting instruction. Considering those factors, the trial court reached a permissible conclusion under OEC 403 in allowing the use of propensity evidence. As to defendant's second assignment of error, the trial court did not commit reversible error by limiting defendant's cross-examination of mother because defendant did not demonstrate that he was prejudiced by any error. As to defendant's third assignment of error, the court did not legally err in concluding that the disputed portions of the mother's testimony were relevant under OEC 401, nor did it abuse its discretion in admitting that evidence over defendant's OEC 403 objection. Finally, even assuming that the court erred by admitting evidence that defendant had hired the expert, there was little likelihood that the jury's verdicts on any of the charges were affected by that error.

Affirmed.

Sean E. Armstrong, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Affirmed.

**SHORR, J.**

Defendant appeals from a judgment of conviction for four sexual offenses involving his stepdaughter. On appeal, he argues that the trial court committed various evidentiary errors and erroneously instructed the jury that it could return a nonunanimous guilty verdict. For the reasons that follow, we affirm.

## I.  BACKGROUND

Because defendant's various assignments of error implicate different standards of review and require us to apply different lenses to the record, we begin with a general overview of the history of the case and provide additional detail within our analysis of particular assignments of error.

The charges in this case followed a disclosure of abuse made by defendant's stepdaughter, L, when she was 11 years old. At the time of that disclosure, L lived with her mother and defendant, who were married; L's mother (mother) also had an older daughter, W, from a previous marriage who lived primarily with her biological father but also spent time at mother's house. L disclosed the abuse to mother and W in 2018 by handing them a handwritten note that said defendant had raped her.

L was later interviewed at Liberty House, a child abuse assessment center, and she described sexual abuse that occurred while defendant was home alone with her. She disclosed that defendant "tried" to put his penis in her vagina and butt. During the interview, L referred to additional handwritten notes describing abuse by defendant.

Following L's disclosures, defendant was charged with one count of first-degree unlawful sexual penetration for penetrating L's vagina with his finger, one count of first-degree sodomy for engaging in anal sexual intercourse with L, one count of attempted first-degree rape for attempting to engage in sexual intercourse with L, and one count of first-degree sexual abuse for touching L's genitals.

Much of the pretrial litigation involved the fact that defendant had been convicted of sexual abuse of a different

stepdaughter during a previous relationship—a fact that was known to L and others by the time of L's disclosure. Those prior convictions had been uncovered earlier by W's father (mother's ex-husband) and were shared through an anonymous account via Facebook shortly after defendant's and mother's wedding. Someone (who defendant believed to be mother's ex-husband) also initiated Department of Human Services (DHS) investigations of defendant and mother's family before L's disclosures. Defendant's theory was that mother's ex-husband had turned W against him, leading L to falsely accuse him of abuse. Defendant filed motions to compel production of the records of the earlier DHS investigations and handwriting samples from L and W based on defendant's suspicion that L's notes describing abuse were "secretly written by the older sister." The court ultimately granted defendant's motions for *in camera* review of the DHS records from 2017 and 2018, and the court required L to provide a handwriting exemplar.

The state, meanwhile, filed a pretrial motion to admit evidence of defendant's earlier convictions. The state argued that the prior convictions, which resulted from a guilty plea, and the facts underlying those convictions, were relevant and admissible as evidence of motive, intent, plan, and absence of mistake or accident, and, separately, as evidence of defendant's sexual propensity towards children. The trial court granted the state's motion but only in part: It ruled that the state could admit court-certified copies of defendant's 2006 convictions for attempted sexual abuse, but that the victim in that case, H, could testify only as to her age and her relationship to defendant at the time of the offenses, not the details of the abuse.

At trial, the state's first witness was H, and the state's evidence regarding the prior convictions was limited to what the court allowed pretrial. A copy of the judgment of convictions was offered and admitted, and H testified that the counts for which defendant entered guilty pleas were for acts that occurred in 2003 and 2004 when she was 13 or 14, at which time she was defendant's adopted daughter. That was the entirety of H's testimony.

The state then called L, who was 12 at the time of trial. She testified that defendant first abused her when he

took her on a camping trip, but she could not remember the year. She testified that the same type of abuse then continued after the camping trip when they were home alone, while her mother was taking classes on Monday nights. Specifically, she testified that defendant would try to put his fingers in her vagina and that they were "partially in, but not completely." She testified that it felt like "a lot of pressure against my skin" and that it hurt.

L further testified that defendant would try to put his penis in either her butt or her vagina, and that her clothes would be "pulled down or scooted aside." She testified that defendant would sit on her back and play with his penis, and that there was often pornography on a TV in the background while the abuse was happening. L described a specific incident in which she was "sick and half asleep" when defendant touched her butt.

L also described the circumstances in which she first disclosed the abuse. She testified that she had gotten in trouble and had been forced to weed strawberries as punishment while defendant, mother, and W had gone to the store. She testified that, when they returned and were upset that she had not finished weeding, she showed her mother and sister a note that she had written while they were gone; that note stated that defendant had "raped me!" and pleaded for help from her mother and sister. L also testified about, and the state introduced, two other notes that she had written describing abuse, but L could not recall whether she had written those notes for her mother or for the abuse assessment center.

L was asked about the fact that her testimony at trial had been different from her grand jury testimony regarding contact with defendant's penis. She acknowledged that, when asked during the earlier proceeding whether defendant's penis had touched her, she had responded "I don't know" or "I don't remember," whereas at trial she had testified that it had. L stated that she had been nervous at the time of the grand jury proceeding.

Following L's testimony, the state called the forensic interviewer who interviewed L at the abuse assessment

center and played parts of the interview for the jury, including L's descriptions of defendant showing her pornography and the abuse that occurred during their camping trip. The interview included, among other things, exchanges in which L explained that defendant "tried" to put his penis in the hole of her butt and in her vagina but that it "[d]idn't work."

Later, the state called L's mother as a witness. Mother testified in ways that corroborated the timing of the camping trip and defendant's use of pornography. As discussed later, mother was also asked whether defendant was "able to get an erection naturally when you two were intimate?" Defense counsel objected on relevance grounds, and the court excused the jury for a break.

The trial court overruled the objection, but during the break another issue came up: Defendant's family members or associates were seen leaving the courtroom and conversing with potential witnesses who had been previously excluded from the courtroom. During questioning outside the presence of the jury, one member of defendant's party, Feeney, admitted that he had been discussing trial testimony with defendant's sisters, who were potential witnesses. Other members of defendant's party, including his parents, denied discussing the case with potential witnesses. The court stated that the "only person whose testimony I actually believe is Mr. Feeney" and that the court did not "find the rest of you to be terribly credible on this topic." However, the court agreed with defendant's suggestion that the group—his parents, Feeney, and another friend—be allowed to attend closing arguments but otherwise be excluded from the courtroom.

Mother retook the stand after the break, and the prosecutor returned to the line of questioning regarding defendant's ability to maintain an erection. Mother stated that defendant required medication to get an erection and that defendant's explanation for that was "[t]hat he was not attracted to me, that I was too fat." The prosecutor then turned to L's abuse allegations and defendant's response to them. According to mother, defendant categorically denied that he had ever touched L and claimed that it was "anatomically impossible for him to have sex with her."

During mother's testimony, the state also played a recording of a call from jail in which defendant told mother that he had been charged with two A felonies and two B felonies and stated that "I have to fight those honey, because the two A felonies, I did not do. I did not do those. Like I—and I told my—I told my attorney that that shit did not happen." During the call, defendant also stated, "I cannot live with kids, I realize that."

On cross-examination, mother was asked about DHS's earlier investigation of defendant. The prosecutor objected to the line of inquiry, arguing that the outcome of the earlier DHS investigations was not admissible. Defendant responded that he would avoid asking about DHS's findings, but rather wanted to know whether the family was investigated, who initiated the request, whether L relayed any concerns at the time, and whether the family remained intact after the investigation—all of which defendant argued were admissible to impeach L's testimony (as opposed to mother's). The trial court sustained the prosecutor's objection on the ground that there was already evidence in the record that L had never disclosed abuse to anyone before July 2018. When cross-examination resumed, mother testified that L had not voiced any concerns about defendant until the summer of 2018.

The state rested its case after mother's testimony, and defendant then called his first witness, his sister Copeland. On direct examination, Copeland, a police officer, testified that she had had opportunities to observe defendant with L and had never seen inappropriate behavior, contrasting defendant's behavior with L with what Copeland had observed during defendant's abusive relationship with H. On cross-examination, the prosecutor established that Copeland understood the importance of witnesses being excluded from the courtroom and then asked, "And knowing all that, you still let an observer yesterday contact you continuously throughout the day and report to you what was happening in court, correct?"

Defendant objected on the basis of relevance, but the trial court overruled the objection. The prosecutor then asked about Copeland's relationship to Feeney, including whether

she knew that Feeney had testified that he was reporting back to potential witnesses about what had transpired in the courtroom. After the prosecutor elicited testimony that Copeland knew Feeney had been "kicked out of the courthouse," the trial court interrupted and took a break.

Outside the presence of the jury, the prosecutor stated that she was done with that line of questioning, and defendant moved for the questions and Copeland's responses be stricken from the record as inflammatory and unduly prejudicial. The state replied that the questions were permissible impeachment, and the trial court denied the motion. On redirect, Copeland testified that her responses in court were not influenced in any way by her interactions with Feeney.

In addition to his other witnesses, defendant testified in his own defense. Among other testimony, defendant denied that he had ever touched L for a sexual purpose or masturbated in front of her. He admitted that he was guilty of sexually abusing H, and that he did not "fight it" but "took full responsibility for that very terrible event, and multiple events of inappropriate contact." He also explained that his relationship with H was different from his relationship with L because, at the time he was abusing H, he was in a different place emotionally and mentally, was not clean and sober, and was not in a happy marriage.

During his testimony, defendant acknowledged that he had "climbed over on [L's] back" during the camping trip but contended that he did so to "pop" L's back because she had back pain. He also denied that he had watched pornography with L, stating that he had watched a documentary about pornography that included nudity and had left it on the screen while L was in the room with him. Defendant testified that he roughhoused with L while he wore pajamas but that it was never his intention "for her to feel anything against me."

Defendant was also asked on direct examination about mother's testimony that he was unable to achieve an erection with her. Defendant testified that he was diagnosed with erectile dysfunction. Counsel then asked him, "Did you

ever tell [mother] as she indicated \*\*\* that you couldn't achieve an erection because you didn't find her attractive?" Defendant responded, "No, I did not ever say that to my wife, and that's actually really terrible that she internalized my failures—." Defendant was interrupted by an objection from the prosecutor, which the court sustained, but said that he "absolutely" disagreed that he had ever said that to mother.

After defendant testified, the defense rested its case and the state called a rebuttal witness, Green, a handwriting expert, to testify about authorship of the handwritten notes that described abuse by defendant. But before asking Green for his opinion on the notes' likely author, the prosecutor asked Green whether he had been contacted by defense counsel and been paid to do a handwriting analysis. Green said that he had been contacted by defense counsel but, before Green discussed hiring, defendant objected. Defendant argued that all of Green's testimony was irrelevant because authorship of the notes ultimately had not been put at issue during trial, and, in any event, "[i]t's not relevant that the Defense paid Mr. Green. And it's only prejudicial that the Defense paid Mr. Green." The prosecutor then said that she would "withdraw that question and instead ask was he hired," and the court stated, "All right. So the objection is overruled in its entirety." When questioning resumed, the prosecutor asked not only whether Green "was hired" but whether Green was "hired by Defense counsel to conduct a handwriting analysis," to which he responded affirmatively. Defendant did not object again at that point, and Green proceeded to opine that the notes had been written by L based on handwriting exemplars that he had reviewed.

The trial court then instructed the jury, including an instruction that "[b]efore considering evidence of [defendant's] prior bad acts, the jury must first answer a question as to whether [he] touched a sexually intimate part of [L]," and that "[i]t is then, and only then," that the jury may consider the evidence "for the limited purposes of its bearing, if any, on whether [defendant] acted with a sexual purpose."

The jury unanimously found defendant guilty on all counts, and he timely appealed the judgment.

## II.  DISCUSSION

On appeal, defendant advances six assignments of error, which we address in turn.

### A.  *Admission of Evidence of Prior Sexual Abuse*

In his first assignment of error, defendant asserts that the trial court erred in admitting evidence of his prior sexual abuse of H. As described above, the court admitted, over defendant's objection, court-certified copies of defendant's 2006 convictions for attempted sexual abuse of H and testimony from H about her age and relationship to defendant at the time of the offenses. The court ruled that that evidence was admissible on two separate grounds: (1) under OEC 404(3), to prove that defendant acted "intentionally" in engaging in sexual conduct with L; and (2) under OEC 404(4), to prove his "sexual interest in children."

With regard to admissibility under OEC 404(3), the state's argument and the trial court's analysis largely tracked the factors set forth in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), *overruled in part by State v. Skillicorn*, 367 Or 464, 479 P3d 254 (2021). *Johns* was still good law at the time of the court's ruling in 2019 for determining whether prior bad acts were relevant to prove "intent." The trial court concluded that defendant's conduct and his convictions involving H were relevant to prove defendant's intent as to L.

The court then conducted balancing under OEC 403 and determined that only a subset of the evidence the state sought to offer was admissible. With regard to probative value, the court explained that "[t]he probative value of the defendant's similar conduct, requiring similar intent, against a similar victim who was in a unique relationship that allowed defendant access to her is high. The strength of some of that evidence is also high—the defendant pled guilty to both prior bad acts." With regard to prejudice and balancing, the court explained:

"Evidence of the prior bad acts is prejudicial because it is relevant. There is the possibility, as in all cases in which the court admits prior bad acts, that the jury could be distracted by this evidence. On these facts, the court does not

conclude that the probative value of the defendant's [three] prior convictions and [H's] testimony as to her age and step-daughter relationship to the defendant at the time the underlying conduct occurred is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The court does not reach the same conclusion with regard to [H's] testimony regarding the specific acts she claims the defendant committed against her because the probative value of her testimony as to the specific acts the defendant perpetrated is unknown.

"As the state intends to offer only the court-certified convictions of the defendant and the testimony of one witness ([H, the previous victim), the court is not concerned about undue delay or the needless presentation of cumulative evidence.

"On balance, the state's need to present these prior bad acts is great as it must prove the defendant's intent with regard to each of the four counts. That need is greater than the defendant's desire to exclude it based upon the concerns identified above, particularly when the jury is already going to hear allegations of remarkably similar conduct against a similarly-situated victim."

The court then separately addressed OEC 404(4). The court explained:

"The decisional authority favoring admissibility of the proffered prior bad acts under OEC 404(4) is more straightforward; the proffered bad acts would all be admissible under OEC 404(4) as evidence that the defendant has a sexual interest in children. The court does not reach a different analysis for admissibility for that purpose under OEC 403 and incorporates its analysis above."

On appeal, the parties agree that the landscape regarding OEC 404(3) and OEC 404(4) has shifted significantly since the trial court's ruling, but they disagree as to whether the trial court's ruling survives those shifts. The state does not defend the court's OEC 404(3) ruling on appeal, and we readily conclude that, in light of the Supreme Court's subsequent decision in *Skillicorn*, the trial court erred in concluding that the evidence was admissible under OEC 404(3) to prove intent. *See State v. Martinez*, 315 Or App 48, 58-59, 499 P3d 856 (2021) (holding that the trial

court erred, in light of *Skillicorn*, in concluding that a theory of relevance that employed propensity reasoning was admissible under OEC 404(3) to prove intent); *State v. Terry*, 309 Or App 459, 463, 482 P3d 105 (2021) (same). However, the state argues that the trial court's admission of the evidence was nonetheless correct under its alternative rationale under OEC 404(4).

Defendant, meanwhile, contends that the trial court's OEC 403 balancing under its OEC 404(4) analysis was based upon and therefore tainted by the court's erroneous understanding of the probative value of the evidence to prove intent. In defendant's view, the trial court's explanation that it "does not reach a different analysis for admissibility for that purpose under OEC 403 and incorporates its analysis above" demonstrates that the court failed to appreciate the different prejudice and probative value of propensity and nonpropensity purposes when conducting its OEC 403 balancing.

The parties' dispute is a variation of one that has arisen multiple times in the wake of *Skillicorn*, as we recently explained:

"In some instances, after determining that a trial court erred in admitting propensity evidence under OEC 404(3), we have considered, '[re]gardless of how the evidence is characterized,' whether the trial court substantively understood that the state's theory of relevance depended on propensity reasoning when it admitted the evidence after balancing under OEC 403. *State v. De Leon Say*, 319 Or App 271, 273, 510 P3d 979 (2022); *Terry*, 309 Or App at 464; *see* [*Martinez*, 315 Or App at 57-58] (considering whether the trial court 'implicitly' understood it was admitting propensity evidence under OEC 404(4)). *** [T]hat is because both the label placed on the evidence—either nonpropensity under OEC 404(3) or propensity under OEC 404(4)—and the substantive content of the arguments for and against admissibility inform our understanding of the trial court's ruling. *State v. Travis*, 320 Or App 460, 469-70, 513 P3d 614 (2022)."

*State v. Cave*, 321 Or App 81, 87-88, 516 P3d 279 (2022).

Unlike some cases in which we have been called upon to determine whether the trial court's ruling demonstrated

that it *implicitly* understood the evidence to be admissible as propensity evidence under OEC 404(4), the trial court here understood the nature of this evidence under OEC 404(4) and then explicitly conducted OEC 403 balancing following its alternative OEC 404(4) rationale. As part of its OEC 404(4) rationale, and prior to undertaking its OEC 403 balancing, the court acknowledged that the evidence was relevant for a propensity purpose, namely defendant's "sexual interest in children." Thus, the question is not whether the trial court conducted the requisite balancing but, rather, whether it abused its discretion in doing so. *See Terry*, 309 Or App at 461 (explaining that our review in this posture is for an abuse of discretion); *cf. Cave*, 321 Or App at 88 ("Although both parties presented arguments regarding the testimony's admissibility as propensity evidence under OEC 404(4), the trial court expressly declined to 'reach that issue because [the testimony] wasn't admitted for a propensity purpose.'"); *Travis*, 320 Or App at 460 (rejecting the state's argument that the trial court conducted balancing with regard to propensity evidence "by implication").

Contrary to defendant's contention, the fact that the trial court incorporated its previous OEC 403 balancing does not itself demonstrate that the trial court failed to appreciate the propensity nature of the evidence. Although the Supreme Court and this court have often explained the differences, both in terms of probative value and prejudice, of propensity and nonpropensity theories, a trial court is not required to explicitly recite those differences as part of its balancing when it is clear that the court understood the purpose for which it was offered. *See State v. Anderson*, 363 Or 392, 406, 423 P3d 43 (2018) ("[T]his court has not held that a trial court must recite on the record how it evaluated the probative and prejudicial value of evidence and how it balanced the two."); *Terry*, 309 Or App at 464 (affirming the trial court's OEC 403 balancing as to some evidence of prior bad acts where, "[r]egardless of the name placed on it, [propensity] was the theory for which the state offered and the trial court admitted the evidence at issue in this case").

Here, viewed in the context of the court's express OEC 404(4) analysis, the court's statement that it did not

"reach a different analysis for admissibility for that purpose under OEC 403 and incorporates its analysis above" indicates that the court reached the same conclusions as it had above—specifically, that the probative value of defendant's three prior convictions and H's testimony as to her age and relationship to defendant to show defendant's propensity to act with a sexual purpose was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of the evidence, but that H's testimony regarding the specific acts of abuse would be excluded under OEC 403 under a propensity theory as well. Again, contrary to defendant's view, we do not assume that a trial court failed to appreciate the potential prejudice from a propensity theory simply because it was not expressly referenced as part of the ruling. Moreover, as discussed below, to the extent that the court incorporated its earlier reasoning, its analysis of the probative value of the evidence included considerations that were substantively based on a propensity theory of sexual purpose. *See Terry*, 309 Or App at 464 (looking to the substance of what the court explicitly balanced rather than the label).

    As we discussed in *Terry*, the Ninth Circuit identified factors in *United States v. LeMay*, 260 F3d 1018 (9th Cir 2001), *cert den*, 534 US 1166 (2002), "to guide a court's exercise of discretion in determining whether to admit evidence of uncharged sexual misconduct in a prosecution for sex crimes." 309 Or App at 465. Those factors include (1) the similarity of the uncharged misconduct; (2) the temporal proximity of the uncharged acts to the charged acts; (3) the frequency of the prior acts; (4) the existence or nonexistence of intervening circumstances; and (5) the need for the evidence in addition to the testimony already offered at trial. *LeMay*, 260 F3d at 1028.

    In *Terry*, we concluded that, "[t]aking those factors into account, we cannot say that the trial court abused its discretion in admitting the evidence of defendant's prior conviction, his statement about the circumstances underlying that conviction, and his statement admitting his attraction to 10- to 13-year-old girls." 309 Or App at 465. We explained

that "[t]he state had a strong need for the evidence, the victim of the charges was close in age to the category of girls that defendant admitted an attraction to, and not too much older than the 10-year-old victim of the prior charges," and the evidence, "although potentially inflammatory, could be addressed through a limiting instruction, something the trial court offered." *Id.*

The same is true in this case. As the trial court explained when discussing the state's theory of "intent" (which, in light of *Skillicorn*, was actually a propensity-based theory), "[t]he probative value of the defendant's similar conduct, requiring similar intent, against a similar victim who was in a unique relationship that allowed defendant access to her is high," and "the state's need to present these prior bad acts is great as it must prove the defendant's intent with regard to each of the four counts." The court further reasoned that the potentially inflammatory nature of the evidence could be addressed by restricting the evidence to the three prior convictions and H's testimony as to her age and relationship to defendant at the time of the abuse—without further factual detail regarding the specific acts—along with a limiting instruction, which the trial court gave. In light of those factors—the underlying offenses and the children's ages and relationships to defendant were very similar, the state needed the evidence to show that defendant acted with a sexual purpose as to each charge in a case where defendant disputed that he had ever touched L with a sexual purpose, and the court made use of a limiting instruction—the trial court reached a permissible conclusion under OEC 403 allowing the use of propensity evidence. As was the case in *Terry*, "[a]lthough other *LeMay* factors point in a different direction, such that the court would have been within its discretion to exclude the evidence as well, it was within its discretion to admit it." 309 Or App at 465; *see also State v. Moles*, 295 Or App 606, 620, 435 P3d 782, *rev den*, 365 Or 194 (2019), *rev allowed and rev'd and rem'd in part on other grounds*, 366 Or 549, 466 P3d 61 (2020) (explaining that "the trial court's decision to admit the evidence to show sexual purpose—even if different from how this court might ultimately have resolved the balancing question in the first instance—represents a permissible exercise of the court's

discretion under the totality of the circumstances in this case").[1] For that reason, we reject defendant's first assignment of error.

B.  *Cross-Examination of Mother Regarding DHS Investigation*

Defendant next assigns error to the trial court's ruling limiting his cross-examination of mother concerning an earlier DHS investigation. Defendant contends that his questions about the DHS investigation, and mother's observations during that investigation, were permissible bases for testing mother's credibility and potential biases and would have produced evidence critical to his theory of defense: namely, that L's allegations were the product of mother's ex-husband's efforts to remove defendant from mother's life; that mother's ex-husband had earlier initiated DHS investigations into the family, but that those investigations did not corroborate abuse because L was not willing to falsely accuse defendant at that time; and that L subsequently became angry at defendant and alleged that abuse had occurred prior to the DHS investigations, despite her previous denials of any abuse to DHS.

On this record, defendant has not demonstrated that the trial court committed reversible error by limiting his cross-examination of mother. After the prosecutor objected to defendant's line of inquiry regarding the earlier DHS investigation, defendant explained that he wanted to ask mother four questions related to the investigation: "Was there an investigation? Do you know who initiated it? Did [L] disclose anything to you during that time? And did the family remain intact after that investigation?" Defendant explained that the questions were for the purpose of impeaching L based on mother's observations of L's responses and demeanor in 2017.

The trial court sustained the state's objection on the ground that there was already evidence in the record that

---

[1] At oral argument, defendant contended that *Moles* and its reliance on *LeMay* when balancing propensity evidence did not survive the court's analysis in *Skillicorn*. We disagree. Since *Skillicorn*, we have understood the *LeMay* factors to be a helpful guide when conducting balancing of prior bad acts for propensity purposes in sexual abuse cases. *See State v. Davis*, 319 Or App 737, 749-50, 511 P3d 10, *rev allowed*, 370 Or 471 (2022) (discussing cases applying the *LeMay* factors, including *Moles* and our post-*Skillicorn* opinion in *Terry*).

L had never disclosed abuse to anyone before July 2018. At that point, defendant did not make an offer of proof as to how mother would have answered any of the questions he wanted to ask. Rather, once cross-examination of mother resumed, defense counsel elicited testimony from mother that defendant remained in mother's household with her and the children until the summer of 2018 and that, prior to the summer of 2018, L did not voice any concerns to her about defendant.

Given that context, we agree with the state that, without an offer of proof, defendant cannot demonstrate he was prejudiced by any error in limiting his cross-examination. The jury heard evidence that L had not previously disclosed any abuse before the summer of 2018, and mother testified that the family remained intact up until that point. We cannot speculate as to what mother may have said about the previous DHS investigation, who initiated it, or what mother may have observed during the investigation, or whether such testimony would have meaningfully differed from other evidence that the jury heard about L's failure to disclose abuse earlier. *See State v. Krieger*, 291 Or App 450, 457, 422 P3d 300, *rev den*, 363 Or 599 (2018) (holding that, in the absence of a sufficient offer of proof, the defendant had not "provided this court with a record from which we can determine whether the error—if any—was harmless"). We therefore reject defendant's second assignment of error.

C. *Admission of Testimony Regarding Defendant's Erectile Dysfunction*

In his third assignment of error, defendant argues that the trial court erred by overruling his objection to the prosecutor's question to mother about defendant's ability to maintain an erection, thereby allowing mother to testify that defendant required medication to get an erection and that defendant told her "[t]hat he was not attracted to [mother], that [she] was too fat." According to defendant, evidence that he experienced erectile dysfunction and blamed it on mother's weight was irrelevant, and, even if marginally relevant, should have been excluded as unduly prejudicial under OEC 403.

We are not persuaded that the court either legally erred in concluding that the evidence was relevant under OEC 401 or abused its discretion in admitting the evidence over defendant's OEC 403 objection. As set out earlier, defendant was charged with first-degree sodomy and attempted first-degree rape, charges that put at issue whether defendant penetrated L's anus with his penis and attempted to penetrate her vagina with his penis; there was also evidence that defendant had stated that it was "anatomically impossible" for him to have sex with L. Evidence of whether defendant could or could not achieve an erection with someone to whom he was sexually attracted was at least marginally relevant to issues in the case, considering the additional evidence that defendant was sexually attracted to children. And, in the context of this trial, the court acted within its discretion in concluding that the probative value of defendant's inability to maintain an erection and his explanation for that inability, minimal as it may have been, was not substantially outweighed by the risk of unfair prejudice. Accordingly, we reject defendant's third assignment of error.

D.   *Impeachment of Copeland*

In his fourth assignment of error, defendant argues that the trial court erred and abused its discretion when it allowed the state to impeach Copeland by asking her about Feeney and whether she knew that Feeney had been kicked out of the courthouse. We disagree. Defendant's family members and friends had been seen leaving the courtroom and conversing with witnesses, and Feeney actually admitted that he had been discussing trial testimony with defendant's sisters, which could have included defendant's sister Copeland. The court also expressly found defendant's parents to have not been credible in claiming that they had not discussed trial testimony with witnesses, again possibly including Copeland. Under the circumstances, the trial court acted within its discretion in allowing the state to briefly explore for impeachment purposes, on cross-examination, whether communications with Feeney outside the courtroom had somehow influenced Copeland's in-court testimony. *Cf. United States v. Erickson*, 75 F3d 470, 480, *cert den*, 517 US 1222 (9th Cir 1996) (describing cross-examination as the "usual remedy" for a potential sequestration violation).

E.  *Admission of Handwriting Expert's Testimony*

In his fifth assignment of error, defendant argues that the trial court erred in overruling defendant's relevance objection to evidence that defendant had hired Green, the handwriting expert who ended up testifying for the state on rebuttal. Defendant argues that, because he ultimately did not present his theory that W wrote the accusatory notes as opposed to L, there was "little need for the expert at all." Moreover, he argues, the fact that *the defense* had hired Green but then abandoned the theory had "absolutely no relevance to any material issue in the case" and served only "to make the defense appear less competent and less credible as a whole."

Defendant's first argument—that Green's testimony was not relevant because he abandoned his theory that the letters were written by W—is not supported by the record. Although defendant did not expressly advance that theory at trial, he did so implicitly, including through questioning of L and other witnesses. Green's testimony was relevant to authorship of the notes, which remained a fact of consequence in the case even if defendant did not press the theory.

The closer question is the relevance of the fact that defendant had previously hired Green. That relevancy question is one that appears to have split courts. *See Fitzgerald v. Roberts, Inc.*, 186 NJ 286, 302-03, 895 A2d 405, 414-15 (2006) (describing disagreement among courts as to "what limitation, if any, should be placed upon the party who is presenting and questioning his adversary's former expert"). However, it is not one that we need to resolve in this case. Even assuming that the court erred by admitting evidence that defendant had hired Green, there is little likelihood on this record that the jury's verdicts on any of the charges were affected by that error. This was a case in which the jury considered testimony from L about the abuse; learned that defendant had previously sexually abused a child, including through defendant's own testimony about the extent of that abuse; heard a jail call in which defendant stated that he could not live with children; and heard defendant's own testimony about what happened during his relationship

with H and why others, like mother's ex-husband and W, were motivated to influence L to falsely accuse him of abuse. Authorship of the notes themselves did not turn out to be a central issue, and the state never pressed on the reasons defendant did not call Green or otherwise imply, as defendant now suggests, that defense counsel was less than competent. Given the nature of the evidence in the case and the role that Green's testimony played, neither the fact that defendant hired Green but did not call him to testify, nor any adverse inferences the jury could have drawn about defendant's case or counsel's competency, had any reasonable likelihood of affecting the jury's deliberations. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (explaining that the appellate courts will affirm a judgment despite evidentiary error if there is "little likelihood that the particular error affected the verdict").

F.   *Nonunanimous Jury Instruction*

Defendant's sixth and final assignment of error is that the trial court erred when it denied his request for a unanimous jury verdict instruction and instead instructed the jury that it could convict defendant by a vote of 10 of 12 jurors. Although the court erred in giving the nonunanimous jury instruction, *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), the error is not reversible because it is not structural error and was harmless beyond a reasonable doubt in light of the fact that all of the verdicts were unanimous. *State v. Flores Ramos*, 367 Or 292, 334, 478 P3d 515 (2020).

In sum, we reject each of defendant's assignments of error for the reasons expressed above.

Affirmed.